1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE NORTHERN DISTRICT OF CALIFORNIA

3

4

5    GROTH-HILL LAND COMPANY,
6    LLC, et al.,

7                    Plaintiffs,                    NO. C13-1362 TEH

8          v.                                       ORDER GRANTING
                                                    DEFENDANTS' MOTIONS TO
9    GENERAL MOTORS LLC, et al.,                    DISMISS

10                   Defendants.

11

12         This case is before the Court on three motions to dismiss Plaintiffs' complaint.  The

13   dispute concerns the downfall of three California auto dealerships.  Two sets of plaintiffs sue

14   three sets of defendants under the Racketeer Influenced and Corrupt Organizations Act

15   ("RICO") and state law.  Having carefully considered the parties' written and oral arguments,

16   the Court now GRANTS the motions and DISMISSES the complaint in its entirety.

17

18   **BACKGROUND**

19   <u>The Plaintiffs</u>

20         **Crown Brothers Chevrolet ("Crown")**, operated by **Pat Costello**, was a family-

21   owned General Motors ("GM") dealership operating out of Dublin, California.  First

22   Amended Complaint ("FAC") ¶ 28.  Crown sold its Cadillac and Chevrolet franchises under

23   financial pressure in September and October of 2008.  FAC ¶¶ 32 & 38.  It now sues the

24   financer of its inventory and two GM employees in their individual capacities, alleging a

25   violation of RICO (Second Cause of Action) and pendent state law claims for fraudulent

26   concealment, breach of the covenant of good faith and fair dealing, and unfair business

27   practices (First, Third, and Fourth Causes of Action, respectively).

28

*United States District Court*
<span style="font-size:smaller">For the Northern District of California</span>

**Plaintiffs Robin Hill and Joseph Hill** were former owners of non-party **Groth Brothers Chevrolet ("GBC")**, another family-owned auto dealership in the San Francisco Bay Area.  FAC ¶ 42.  In 2008, GBC breached its inventory financing agreement with Defendant Ally.  FAC ¶¶ 47-48.  The **Groth-Hill Land Company, LLC ("GHLC")**, a company partially owned by Plaintiffs Robin and Joseph Hill, pledged a piece of property as security for GBC's debt to Defendant Ally.  FAC ¶¶ 44, 50- 56.  The Groths and GHLC, collectively known as the **"Groth Plaintiffs,"** were forced to sell the property at a loss in order to pay Defendant Ally in June of 2009.  FAC ¶ 56.  Ally eventually terminated GBC's financing in December, 2010.  FAC ¶ 69.[1]  GBC went bankrupt in 2011 and its assets were sold to Inmato, LLC, a company owned by Defendant Inder Dosanjh, in November, 2011.  FAC ¶ 76.  The Groth Plaintiffs bring a cause of action under RICO (Seventh Cause of Action) and pendent state law claims for promissory fraud, fraudulent concealment, intentional infliction of emotional distress, unfair business practices, and declaratory relief (Fifth, Sixth, Eighth, Ninth, and Tenth Causes of Action, respectively) against all Defendants.

The Defendants

Plaintiffs sue three sets of defendants.

**Defendant Ally Financial Inc**. (**"Ally,"** formerly "GMAC") provided inventory financing, known as "floorplan" financing, to both dealerships pursuant to contractual agreements called Wholesale Security Agreements.  **Defendant Kevin Wrate** is Ally's Director of Sales.  FAC ¶ 20.

Non-party **General Motors Corporation ("Old GM")** issued franchises to both Crown and GBC to sell GM vehicles.  Old GM went bankrupt in 2009 and its assets were sold free and clear of liability under section 363 of the Bankruptcy Code to **Defendant**

---

[1] In what seems to be a misprint, the FAC states the date as "December, 2012."  FAC ¶ 69.

**General Motors LLP ("New GM")** on July 10, 2009.  FAC ¶ 5; GM RJN Exs. A & B.
New GM was also assigned GBC's Dealer Agreement (Crown's agreement had already been
terminated in 2008).  *Id.*  **Defendants Randy Parker and James Gentry** are former
employees of Old GM who became employees of New GM simultaneously with the July 10,
2009 bankruptcy sale ("363 Sale").  FAC ¶¶ 7-8.  In 2010, Defendant Gentry left New GM
and became Chief Operating Officer of Defendant California Automotive Retailing Group.
FAC ¶ 8.

  **Defendant California Automotive Retailing Group, Inc. ("CARG")** is a
corporation that owns several GM franchises doing business in Alameda County, California.
FAC ¶ 11.  Defendant **Inder Dosanjh**, a California resident, "controlled the business
operations" of CARG.  FAC ¶ 10.  CARG/Dosanjh purchased the assets of the Crown
dealership, FAC ¶¶ 37-39, while Inmato, also owned by Dosanjh, acquired GBC's assets
after the bankruptcy.  Plaintiffs allege that CARG/Dosanjh acquired the dealerships pursuant
to a conspiracy by all Defendants to drive independent East Bay dealerships out of business
and steer control of the market to Dosanjh.  *See* FAC ¶¶ 21-24.


Crown Chevrolet's Decline

  Crown alleges the following facts:

  In 2008, Ally, Crown's "floorplan"[2] lender, began auditing Crown and imposing
monthly curtailment charges.  FAC ¶ 29.  Ally then asked Pat Costello, Crown's owner, to
make a $400,000 lump sum "curtailment pay-down" of Crown's floorplan debt.  FAC ¶ 30.
Ally "pressured" Costello to provide additional security for future repayment of the
remainder of Crown's debt in the form of a first deed of trust on the dealership property.
According to Costello, Wrate said Ally would terminate Crown's floor plan if he did not

---

  [2] A "floorplan" is the dealership's inventory financing.  When the dealer buys a
vehicle from GM, Ally "floors" the vehicle by advancing the purchase price to GM.  When
the dealer sells a "floored" vehicle, it must repay the advance to Ally immediately.  If it fails
to do so, the dealer is said to go "out of trust," in breach of its floorplan financing agreement.
*See* FAC ¶¶ 47-48.

comply with these requests.  FAC ¶ 30.  Defendant Parker (of GM) then called Costello and asked how he was planning to address the dealership's financial problems.  FAC ¶ 31. Costello told him Parker was considering selling Crown's Cadillac dealership to raise the money to repay Ally.  Parker stated that "this was the right move, and that [Costello] needed to sell ... to Inder Dosanjh, as he was the only candidate who would be approved for the transaction."  FAC ¶ 31.  Having "no real alternative," Costello agreed to sell the Cadillac franchise to Dosanjh for $300,000.  FAC ¶ 32.  Costello turned over the proceeds to Ally and assumed that this would "stop Kevin Wrate and Ally from continuing to harass him [Costello]."  FAC ¶ 33.

On September 26, 2008, two weeks after the sale to Dosanjh, Ally sent a letter stating that the sale violated the Wholesale Security Agreement (the financing agreement between Crown and Ally) because Ally had a security interest in all of Crown's assets.  FAC ¶ 34. Ally charged that Costello had made $1.75 million from the sale and demanded payment of the $1.75 million in proceeds by September 30, 2008.  FAC ¶ 35.  Costello called Wrate to point out the mistaken sale price figure, but Ally terminated Crown's floor plan financing nonetheless.  FAC ¶ 35.

"Left with no floorplan and very few alternatives," Costello called Defendant Parker of GM, who stated that Costello needed to sell the Chevrolet franchise to Dosanjh.  FAC ¶ 36.  Costello wanted to sell the dealership to a Toyota dealer, but Parker stated that "GM would not approve [that purchaser's] purchase of Crown Chevrolet, and that Dosanjh was the only dealer that GM would approve."  FAC ¶ 37.  Parker instructed Costello to surrender the franchise to GM, which would award it to Dosanjh, and sell the parts and equipment to CARG separately.  FAC ¶ 39.  Crown acquiesced in both requests.  FAC ¶ 38.

Crown states that because it was "one for the first dealerships to fall," it did not suspect a larger scheme to obtain control over multiple East Bay dealerships and therefore did not investigate further until 2012.  FAC ¶ 41.

United States District Court

For the Northern District of California

GBC's Decline

The Groth Plaintiffs allege the facts as follows:

GBC was a family-owned dealership owned and operated by Plaintiff Robin Hill's family for three generations.  In 2007, GHLC, owned by the Groths, bought a parcel of land for $3.1 million as a new location for GBC.  FAC ¶ 44.  Although GM was initially supportive of this purchase and agreed to provide financial assistance, Gentry and GM did not follow through with the assistance they promised.  FAC ¶¶ 44-45.  Instead, as part of a conspiracy to drive GBC out of business, Ally began "auditing the dealership's floorplan and imposing harsh curtailments on the dealership's inventory financing."  FAC ¶ 44.  This caused GBC to go "out of trust,"[3] breaching its Wholesale Financing Agreement with Ally and entitling Ally, under the terms of the agreement, to terminate GBC's floorplan financing.  FAC ¶¶ 47-48.

Ally then carried out a scheme to obtain personal guarantees from the Groths of the corporation's debt, before Ally drove GBC out of business.  FAC ¶¶ 49-51.  Ally contacted Plaintiff Robin Hill and stated that Ally would terminate GBC's floorplan unless the Groths provided personal guarantees of all of the dealership's debt, including a first position deed of trust on the GHLC property; released Ally from all claims of wrongdoing; and promised to pay Ally all amounts owed within 90 days.  FAC ¶ 50.  Feeling that they had "no choice," the Groth Plaintiffs signed over a Secured Guaranty on the GHLC property in October, 2008.  FAC ¶ 52 & Ex. D.  In November, GBC, the Groths, GHLC, and GMAC (Ally's precursor) executed a Forbearance Agreement and Release, continuing the parties' relationship.  FAC ¶ 52 & Ex. E.  On June 1, 2009, the Groths had to "fire sale" the property for $1.7 million, half of the price they paid for it, and turn over the proceeds to Ally in order to preserve GBC's flooring.  FAC ¶ 56.

Plaintiffs allege that Defendant Dosanjh was "intimately involved in orchestrating these financial pressures" on GBC, and that he was "observed having phone calls with Kevin

---

[3] *See* note 2, *supra*.

United States District Court

For the Northern District of California

1    Wrate [of Ally], where Dosanjh and Wrate discussed how Ally was going to apply financial

2    pressure on [GBC] to put it out of business."  Further, Plaintiffs allege, Dosanjh stated – it is

3    unclear to whom – "I'm going to put that cunt [Robin Hill] out of business, and GM is going

4    to help me do it."  FAC ¶ 57.

5        Plaintiffs also allege that in April, 2010, Ally sent a copy of a letter addressed to

6    Robin Hill about the dealership's situation to Robin Hill's elderly parents, the prior owners

7    of the dealership, despite an agreement not to do so.  FAC ¶¶ 59-61 & Ex. H.  Robin Hill's

8    mother died two days after receiving the letter.  FAC ¶ 62.

9        On April 19, 2010, Ally filed suit against GBC, seeking to seize the dealership's

10   inventory and seeking a TRO.  FAC ¶ 63; Ally Mtn. at 14.  The court, according to Plaintiffs,

11   found that GBC was not in default and denied the TRO request.  *Id.*[4]  Ally then agreed to

12   continue working with the dealership, and proposed a series of workout agreements dated

13   May, August, September, and November of 2010, in which Ally extended the floorplan

14   financing in exchange for GBC's release of any claims against it.  FAC ¶ 64 & Exs. I-M; *see*

15   *also* Dkt. No. 15 (table of workout/forbearance agreements).  GM and Dosanjh orchestrated

16   several more attempts "to pressure Robin Hill into voluntarily relinquishing control" of the

17   GBC dealership, FAC ¶¶ 65-57, before Ally eventually terminated GBC's floorplan on

18   December 20, 2010.  FAC ¶ 69.

19       GBC filed for Chapter 11 bankruptcy (reorganization) on May 18, 2011.  FAC ¶ 73.

20   GM RJN Ex. C.[5]  The Bankruptcy Court converted the case to one under chapter 7

21   (liquidation) in August, 2011, and appointed a chapter 7 trustee.  GM RJN Ex. E.  On

22   November 14, 2011, the Bankruptcy Court granted the trustee's motion for sale of GBC's

23   property and intangible assets to the highest bidder, Inmato, Inc., a company controlled by

24

25

26       [4] No record of this lawsuit is provided with the FAC.

27       [5] The Court grants Defendants' unopposed request for Judicial Notice (Dkt. Nos. 5, 9
     & 13) of various bankruptcy and superior court filings in this matter.  *See* Fed. R. of Evid.
28   201.

Dosanjh, for $550,000.[6]  Nov. 14, 2011 Sale Order (GM RJN Ex. K).  Among the assets sold to Inmato were "all legal claims and causes of any kind for past, present, or future damages against third parties."  Dkt. No. 9-11 ¶ 3(c).  Plaintiffs allege that one month later, Inmato sold all of the assets it had just purchased, apart from the legal claims, for $140,000, indicating that "Dosanjh's purchase, and instant resale, of the [GBC] assets was merely a ploy to buy out the dealership's legal claims so that Defendants could not be sued for their wrongful conduct."  FAC ¶ 76.

Plaintiffs allege a broad conspiracy by the Ally, GM, and CARG Defendants to drive them out of business.  *See* FAC ¶ 21-22.  They allege that Defendants Parker, Gentry and Wrate were to coerce the dealerships to sell to Dosanjh's company, and in return, Dosanjh would "provide the GM managers with illegal kickbacks."  *Id.*

Litigation History

On March 12, 2012, the Groth Plaintiffs filed suit in Alameda Superior Court on behalf of the Groths, GHLC, and GBC, asserting antitrust, contract, and fraud claims.  Dkt. No. 9-12.  Defendants removed the action to Bankruptcy Court and moved to dismiss the complaint as an invalid collateral attack on the November 14, 2011 Sale Order.  Dkt. Nos. 9-13 & 9-16.  Plaintiffs withdrew the complaint.  Dkt. No. 9-17.  In October, 2012, Plaintiffs filed this action in state court.  Dkt. No. 9-19.  Defendants demurred in state court.  Plaintiffs filed a First Amended Complaint ("FAC") on February 25, 2013, in which the Crown Plaintiffs joined, adding claims under RICO.  Defendants removed to federal court in March, 2013.

---

[6] The parties refer to the sale as one to Inmato, LLC, owned by Dosanjh.  The November 14, 2011 Sale Order, however, refers to the purchaser as "California Automotive Retailing Group, Inc. and/or assignee."  Dkt. No. 9-11 ¶ 2.  Either scenario left the assets under Dosanjh's control.

United States District Court

For the Northern District of California

**LEGAL STANDARD**

Defendants move to dismiss Plaintiffs' complaint under Federal Rules of Civil Procedure 9(b) and 12(b)(6), for failure to state a claim.  Generally, a complaint must contain "a short and plain statement" showing "the grounds for the court's jurisdiction" and "that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a).  Claims based on allegations of fraud are subject to a heightened pleading standard: they must be pled "with particularity."  Fed. R. Civ. P. 9(b).

Dismissal is appropriate under Rule 12(b)(6) when a complaint fails "to state a claim upon which relief can be granted."  A claim will survive a motion to dismiss if the complaint's "non-conclusory factual content, and reasonable inferences from that content" plausibly suggest that the plaintiff is entitled to the requested relief.  *Moss v. United States Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009) (internal quotation marks omitted) (citing *Ashcroft v. Iqbal*, 555 U.S. 662 (2009)).

In ruling on a motion to dismiss, a court must "accept all material allegations of fact as true and construe the complaint in a light most favorable to the non-moving party."  *Vasquez v. Los Angeles County*, 487 F.3d 1246, 1249 (9th Cir. 2007).  However, "to be entitled to the presumption of truth, allegations in a complaint . . . may not simply recite the elements of a cause of action, but must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively."  *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011).  Additionally, "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation."  *Id.*

Unless amendment would be futile, leave to amend should be freely granted.  Fed. R. Civ. P. 15(a)(2).

1   **DISCUSSION**

2   **I. CLAIMS BY CROWN BROTHERS CHEVROLET**

3      Crown asserts against Defendants Ally and its sales director, Wrate, as well as Gentry

4   and Parker of GM (but not GM itself): 1) a claim under RICO; 2) state law claims for

5   fraudulent concealment, breach of the implied covenant of good faith and fair dealing, and

6   unfair business practices under California's Unfair Competition Law.

7      Before reaching the individual claims, the Court considers the global argument by

8   Defendants Parker and Gentry, former employees of Old GM, that Old GM's 2009

9   bankruptcy shields them from liability incurred during the tenure of Old GM.  The July 5,

10  2009 bankruptcy Sale Order ("363 Sale Order") states: "[N]one of the Purchaser [New GM],

11  its . . . agents, officials, personnel, representatives, or advisors shall have any liability for any

12  claim that arose prior to the Closing Date, relates to the production of vehicles prior to the

13  Closing date, or otherwise is assertable against the Debtors [Old GM] or is related to the

14  Purchased Assets prior to the Closing Date."  GM RJN Ex. B. (Dkt. No. 9-2) ¶ 46.

15     Defendants cite *Matter of Met-L-Wood Corp.,* 861 F.2d 1012, 1016 (7th Cir. 1988),

16  and *In re Grantham Bros.,* 922 F.2d 1438, 1442 (9th Cir. 1991), as support for their

17  argument that the 363 Sale Order extends to them in their personal capacities.  Both cases

18  prohibited collateral attacks on final bankruptcy orders and tell us nothing about whether the

19  363 Sale Order insulates Old GM's employees against allegations of tortious conduct.

20  Plaintiffs cite *Michaelis v. Benavides,* 61 Cal. App. 4th 681, 686 (1998), and general

21  principles of the law of agency for the proposition that an agent or employee is always liable

22  for his or her tortious activity.  *See also Shafer v. Berger, Kahn, Shafton, Moss, Figler, Simon*

23  *& Gladstone*, 107 Cal. App. 4th 54, 68 (2003) ("An agent or employee is always liable for

24  his own torts, whether his employer is liable or not" (internal quotation marks and citations

25  omitted)); Cal. Civ. Code § 2343 ("One who assumes to act as an agent is responsible to third

26  persons as a principal for his acts in the course of his agency . . . [w]hen his acts are wrongful

27  in their nature.").  The Court agrees with Plaintiffs.

28     The Bankruptcy Sale Order was intended to insulate the purchaser of the bankrupt

*United States District Court*
For the Northern District of California

United States District Court

For the Northern District of California

1    corporation's assets from any liability obligations incurred by the bankrupt corporation.

2    Plaintiffs allege individual liability on the part of individuals who worked for Old GM and

3    later worked for New GM. Had the individuals gone on after Old GM's bankruptcy to work

4    elsewhere, they would carry their individual liability with them there, too. The Sale Order's

5    purpose is to shield New GM; contrary to Defendants' contention, Crown's claims are not

6    "against New GM." *See* GM Mtn. at 10. Crown asserts neither direct nor vicarious liability

7    on the part of New GM. There is nothing in the language of the 363 Sale Order, nor in the

8    purpose behind it, which purports to shield individuals from individual judgments stemming

9    from their tortious activity. Crown may sue Parker and Gentry for torts they committed in

10    their individual capacities, to the extent that the law allows for such recovery.[7]

11    Finding that the 363 Sale Order does not shield Defendants Parker and Gentry from

12    liability, the Court now addresses each of Crown's claims, beginning with the federal claim

13    and moving to the state law claims.

14

## A. RICO Claim

16    Crown brings a civil RICO claim against Defendants Ally, Wrate, Parker and Gentry

17    based on predicate acts of mail and wire fraud. *See* 18 U.S.C. §§ 1961(1), 1962(c) & (d).[8]

18    Defendants argue that the claim is time-barred.

19    Civil RICO claims are subject to a four-year statute of limitations. *Agency Holding*

20    *Corp. v. Malley-Duff & Assocs., Inc.,* 483 U.S. 143, 156 (1987). The limitations period

21    begins to run "when a plaintiff knows or should know of the injury that underlies his cause of

22    action." *Grimmett v. Brown*, 75 F.3d 506, 510 (9th Cir. 1996) (internal quotation marks and

23    _____

24        [7] Defendants Parker and Gentry have not argued that there is no individual liability
      under the causes of action alleged. The Court therefore does not consider this issue.

25

26        [8] The elements of a RICO claim are: (1) conduct (2) of an enterprise (3) through a
      pattern (4) of racketeering activity. *Sedima v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985). A
      defendant has committed the predicate racketeering act of mail fraud if s/he: (1) "formed a

27    scheme or artifice to defraud;" (2) "used the United States mails . . . in furtherance of the
      scheme;" and (3) "did so with the specific intent to deceive or defraud." *Schreiber Distrib.*

28    *Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1400 (9th Cir. 1986) (citations omitted).

United States District Court

For the Northern District of California

1  citation omitted). Crown's self-described injury is that it was "forced to sell its Cadillac . . .

2  [and] Chevrolet franchise[s]," and forced to do so "for a fraction of [their] fair market value."

3  FAC ¶ 108.

4      Notwithstanding the fact that it sold its dealerships in 2008, FAC ¶¶ 32 & 38, Crown

5  argues that it "did not discover, nor could it have reasonably discovered, that it had been

6  injured until late 2012 when Costello was subpoenaed to testify as a witness in this case."

7  FAC ¶ 109. Specifically, Crown argues that its claim is timely based on either: (a) a delayed

8  commencement of the limitations period due to its delayed discovery of the injury, or (b)

9  tolling of the statute of limitations under the doctrine of fraudulent concealment. Both

10  arguments are unavailing.

11      1. Delayed commencement of the limitations period

12      The Ninth Circuit follows the "injury discovery" rule for determining when a RICO

13  cause of action accrues. *Grimmett*, 75 F.3d at 511. Under this rule, the limitations period

14  begins to run "when a plaintiff knows or should know of the injury which is the basis for the

15  action." *Volk v. D.A. Davidson & Co.,* 816 F.2d 1406, 1415 (9th Cir. 1987). The plaintiff

16  "need not discover that the injury is part of a 'pattern of racketeering' for the period to begin

17  to run." *Grimmett*, 75 F.3d at 510 (quoting *McCool v. Strata Oil Co.,* 972 F.2d 1452, 1465

18  (7th Cir. 1992)). This is because the focus of RICO is on the predicate acts, not on the RICO

19  violation. *Grimmett*, 75 F.3d at 511 (citing *Sedima*, 473 U.S. at 497).

20      In *Grimmett*, the plaintiff argued that her claim accrued when she realized there was

21  another victim of the defendant's scheme and thereby discovered the "pattern" of the

22  defendant's alleged conspiracy. 75 F.3d at 510-11. The Ninth Circuit squarely rejected this

23  argument, finding that the cause of action accrued at the time the plaintiff was injured, not at

24  the time she discovered all of the elements of her RICO cause of action. *Id.* at 511-12 (the

25  "argument . . . that a plaintiff's cause of action should not accrue until she has discovered

26  that all elements exist . . . is wrong."). Here too, the factual injury determines the

27  commencement of the limitations period.

28      Crown asserts that its RICO injury was the sale of the dealerships at a monetary loss.

1   FAC ¶ 108.  These losses were sustained in September and October of 2008.  FAC ¶¶ 32 &

2   38.  The injury was not hidden; Crown was aware that it sold its dealerships and that it sold

3   them at below-market prices at the time it actually sold them.  Under the injury discovery

4   rule, which the Ninth Circuit has "faithfully followed" for over a decade, *Grimmett*, 75 F.3d

5   at 511, the cause of action accrued on or before October, 2008, when Costello sold its last

6   dealership.  The limitations period began to run at that time.

7         2. Tolling based on fraudulent concealment

8         Crown next argues that even if the limitations period began to run in 2008, it should

9   be tolled based on Defendants' fraudulent concealment of the cause of action.  *See Pincay v.*

10  *Andrews*, 238 F.3d 1106, 1110 (9th Cir. 2001) (equitable tolling doctrines, including

11  fraudulent concealment, apply in civil RICO cases); *Grimmett*, 75 F.3d at 514 . The doctrine

12  of fraudulent concealment "is properly invoked . . . if a plaintiff establishes affirmative

13  conduct upon the part of the defendant which would, under the circumstances of the case,

14  lead a reasonable person to believe that he did not have a claim for relief."  *Pincay,* 238 F.3d

15  at 1110 (internal quotation marks and citation omitted).  A party seeking tolling on this basis

16  must demonstrate that it "had neither actual nor constructive notice of the facts constituting

17  the[] claims for relief."  *Volk v. D.A. Davidson & Co.,* 816 F.2d 1406, 1415 (9th Cir. 1987)

18  (citation omitted); *Pincay*, 238 F.3d at 1110.  Thus, a defendant's silence or passive conduct

19  does not constitute fraudulent concealment.  *Volk*, 816 F.2d at 1416 (citing *Rutledge,* 576

20  F.2d at 250); *Grimmett*, 75 F.3d at 515 ("A [defendant's] failure to 'own up' does not

21  constitute *active* concealment" (emphasis in original) (citation omitted)); *see also*

22  *Pocahontas Supreme Coal Co., Inc. v. Bethlehem Steel Corp.,* 828 F.2d 211, 218-19 (4th Cir.

23  1987) ("To permit a claim of fraudulent concealment to rest on no more than an alleged

24  failure to own up to illegal conduct[,]" even after an inquiry by plaintiff, "would effectively

25  nullify the statute of limitations in these cases").  Likewise, a plaintiff's mere ignorance of

26  her cause of action does not, in itself, toll the statute of limitations.  *Grimmett*, 75 F.3d at

27

28

515; *Volk*, 816 F.2d at 1416.[9]

Plaintiffs seeking tolling based on fraudulent concealment must "plead with particularity the facts giving rise to the fraudulent concealment claim." *Volk*, 816 F.2d at 1415; Fed. R. Civ. P. 9(b). Here, the complaint alleges no affirmative conduct by Defendants that misled Crown about a potential cause of action between 2008, when it suffered an injury putting it on inquiry notice, and 2012, when it discovered the Groths' similar situation. Defendants' failure to "own up" to the alleged conspiracy in the aftermath of the dealership sales is plainly insufficient to support tolling based on fraudulent concealment.

Accordingly, Crown's RICO claim is barred by the statute of limitations. The Court DISMISSES the claim WITHOUT PREJUDICE.

## B. State Law Claims

### 1. Fraudulent Concealment

In order to state a claim for fraud based on concealment,

> (1) the defendant must have concealed or suppressed a material fact, (2) the defendant must have been under a duty to disclose the fact to the plaintiff, (3) the defendant must have intentionally concealed or suppressed the fact with the intent to defraud the plaintiff, (4) the plaintiff must have been unaware of the fact and would not have acted as he did if he had known of the concealed or suppressed fact, and (5) as a result of the concealment or suppression of the fact, the plaintiff must have sustained damage.

*Kaldenbach v. Mut. of Omaha Life Ins. Co.*, 178 Cal. App. 4th 830, 850 (2009) (internal quotation marks and citation omitted).

Crown argues that Defendants Ally and Wrate concealed the facts that: the Defendants "were all working together to funnel business to Dosanjh and/or CARG;" that "Ally and Wrate had no intention of allowing Crown to remain in business, and instead intended to force Crown to sell its . . . franchises to Dosanjh and/or CARG;" "that all demands for payments made by Ally and Wrate . . . were not legitimate business requests,

---

[9] In *Volk*, the defendant's "passive concealment" of certain reports "by not disclosing them to the investors" was insufficient to invoke tolling, because the defendant had not taken any "affirmative steps to mislead." *Id.*

1   but were designed solely to put financial pressure on Crown;" and "that this financial

2   pressure was put on Crown so that it would be forced to terminate or sell its . . . franchises so

3   that they could be funneled to Dosanjh and/or CARG."  FAC ¶¶ 78 & 81; Opp'n at 7.

4        Defendants respond that this essentially accuses them of concealing their intent to

5   commit an intentional tort.  This is not cognizable as fraud, they argue, for there is no legal

6   obligation to disclose an intent to commit a tort.  *See* Ally Reply at 5-6.  The Court agrees.

7   Even the case Crown itself cites concludes that:

8        Although inferentially, everyone has a duty to refrain from
         committing intentionally tortious conduct against another, it does
9        not follow that one who intends to commit a tort owes a duty to
         disclose that intention to his or her intended victim. The general
10       duty is not to warn of the intent to commit wrongful acts, but to
         refrain from committing them. We are aware of no authority
11       supporting the imposition of additional liability on an intentional
         tortfeasor for failing to disclose his or her tortious intent before
12       committing a tort.

13  *LiMandri v. Judkins*, 52 Cal. App. 4th 326, 338 (1997) (internal quotation marks and citation

14  omitted); *accord Bank of Am. Corp. v. Superior Court*, 198 Cal. App. 4th 862, 872-73 (2011)

15  ("Countrywide had a duty to refrain from committing fraud[;] it had no independent duty to

16  disclose to its borrowers its alleged intent to defraud its investors").

17       Because Crown fails to allege that Defendants concealed a fact which they were under

18  a duty to disclose, the Court DISMISSES the fraudulent concealment claim WITHOUT

19  PREJUDICE.

20

21       **2. Breach of the Covenant of Good Faith and Fair Dealing**

22       Under California law, "every contract contains an implied covenant of good faith and

23  fair dealing that neither party will do anything which will injure the right of the other to

24  receive the benefits of the agreement."  *Wolf v. Walt Disney Pictures & Television,* 162 Cal.

25  App. 4th 1107, 1120 (2008) (internal quotation marks and citation omitted).  The covenant is

26  "limited to assuring compliance with the *express terms* of the contract, and cannot be

27  extended to create obligations not contemplated by the contract."  *Pasadena Live, LLC v.*

28  *City of Pasadena,* 114 Cal. App. 4th 1089, 1094 (2004) (emphasis in original).  It "will not

United States District Court

For the Northern District of California

14

United States District Court
For the Northern District of California

1  be read into a contract to prohibit a party from doing that which is expressly permitted by the

2  agreement itself." *Wolf*, 162 Cal. App. 4th at 1120; *see also Kimball v. Flagstar Bank F.S.B.,*

3  881 F. Supp. 2d 1209, 1218-19 (S.D. Cal. 2012).[10]

4          Defendants argue the claim is time-barred.  A claim of breach of the covenant of good

5  faith and fair dealing has a four-year statute of limitations when, as here, the claim sounds in

6  contract.  *See Kimball*, 881 F. Supp. 2d at 1219 n.4 (citing *Love v. Fire Insurance Exchange,*

7  221 Cal. App. 3d 1136, 1144 n.4 (1990)); Ally Mtn. at 7; FAC ¶ 112.  In general, a breach of

8  contract cause of action accrues at the time of the breach, and the statute of limitations period

9  begins to run at that time.  *Cochran v. Cochran*, 56 Cal. App. 4th 1115, 1120 (1997).  As

10  with the RICO claim above, the events giving rise to any cause of action here took place in

11  2008 or earlier, more than four years before Crown joined in this action.  Crown again argues

12  that the statute of limitations should be tolled under the "delayed discovery" rule or the

13  doctrine of fraudulent concealment.

14          The discovery rule "postpones accrual of a cause of action until the plaintiff discovers,

15  or has reason to discover, the cause of action."  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal.

16  4th 797, 807 (2005).  "A plaintiff has reason to discover a cause of action when he or she has

17  reason at least to suspect a factual basis for its elements[,]" or to "suspect that a type of

18  wrongdoing has injured them."  *Id.* (internal quotation marks and citation omitted).  "In other

19  words, plaintiffs are required to conduct a reasonable investigation after becoming aware of

20  an injury, and are charged with knowledge that would have been revealed by such an

21  investigation."  *Id.* at 808.  In order to survive a motion to dismiss using the discovery rule, a

22  plaintiff must specifically plead facts showing: "(1) the time and manner of discovery *and* (2)

23  the inability to have made earlier discovery despite reasonable diligence."  *E-Fab, Inc. v.*

24  *Accountants, Inc. Servs.*, 153 Cal. App. 4th 1308, 1319 (2007) (internal quotation marks and

25  citation omitted) (emphasis in original).  In other words, a plaintiff must plead, in a non-

26  conclusory manner, facts showing that "despite diligent investigation of the circumstances of

27  _____

28          [10] Neither Crown nor the Groth Plaintiffs claim that Defendants breached any of the relevant contracts.

15

the injury, he or she could not have reasonably discovered facts supporting the cause of action within the applicable statute of limitations period." *Fox*, 35 Cal. 4th at 809.

Crown alleges that Defendants breached the covenant of good faith and fair dealing implied in Crown's floor plan financing agreement with Ally, which required Ally to provide Crown with a floor plan and Crown to timely pay its financial obligations to Ally.  FAC ¶ 113.  As with the RICO claim above, Crown argues that the limitations period did not begin to run until Costello was subpoenaed in the Groths' case in late 2012.  FAC ¶ 118; Opp'n at 9-10 (Costello then discovered that "other dealers had also been targeted . . . for closure" and obtained a copy of the Groths' complaint).

The discovery that other East Bay auto dealerships had been "targeted for closure" is irrelevant to the claim that Ally breached the implied covenant of good faith and fair dealing in its floor plan financing agreement with Crown, having no bearing on Crown's right to receive the benefits of its agreement.  The discovery of the Groths' case therefore had no effect on the statute of limitations in Crown's claim.  Crown was put on inquiry notice in 2008, when it was forced to close due to the financial pressure exerted on it by Ally.  Accordingly, the discovery rule affords no relief.

Crown's fraudulent concealment argument similarly fails.  Under this doctrine, a "defendant's fraud in concealing the cause of action against him tolls the applicable statute of limitations," but only "for the period during which the claim is undiscovered by plaintiff, or until such time as plaintiff, by exercise of reasonable diligence, should have discovered it." *Berson v. Browning-Ferris Industries*, 7 Cal. 4th 926, 931 (1994) (internal quotation marks and citation omitted).  The rationale for this rule is that "the culpable defendant should be estopped from profiting by his own wrong *to the extent* that it hindered an otherwise diligent plaintiff in discovering his cause of action." *Sanchez v. S. Hoover Hospital*, 18 Cal. 3d 93, 100 (1976) (internal quotation marks and citation omitted).  Again, Plaintiffs' allegations establish that Crown had notice of the facts giving rise to its claim in October, 2008, when it was forced to sell the dealerships.  It was put on inquiry notice at that time.  Plaintiffs do not

United States District Court
For the Northern District of California

allege any facts suggesting that fraud by Ally hindered Crown in discovering the existence of the cause of action.

The Third Cause of Action is DISMISSED WITHOUT PREJUDICE as barred by the statute of limitations.

### 3. Unfair Business Practices

California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200 *et seq.*, allows civil actions for injunctions to be brought by any "person who has suffered injury in fact and has lost money or property as a result of the unfair competition," *id.* § 17204, against "[a]ny person who engages, has engaged, or proposes to engage in unfair competition," *id.* § 17203. "Unfair competition" is defined as "any unlawful, unfair or fraudulent business act or practice." *Id.* § 17200. Defendants again argue the claim is barred by the statute of limitations.

The parties agree that the claim is subject to a four-year statute of limitations. *Id.* § 17208. Crown brings its claim under the "unlawful" prong, which "borrows violations of other laws and treats them as unlawful practices that the [UCL] makes independently actionable." *Aryeh v. Cannon Business Solutions*, *Inc.*, 55 Cal. 4th 1185, 1196 (2013) (internal quotation marks and citation omitted). Crown's UCL claim therefore is premised on its civil RICO, fraudulent concealment, and breach of the covenant of good faith and fair dealing claims, which define the parameters of the "unfair competition" that Crown alleges. Opp'n at 14. Its UCL claim arose, and the statute of limitations began to run, at the time the underlying causes of action accrued, subject to any applicable exceptions. *Aryeh,* 55 Cal. 4th at 1196. For the reasons discussed above, the claim is untimely and is therefore DISMISSED WITHOUT PREJUDICE.

## II. CLAIMS BY GROTH PLAINTIFFS

Robin Hill, Joseph Hill, and the Groth-Hill Land Company ("GHLC"), collectively the "Groth Plaintiffs," bring one federal cause of action under RICO and five pendent state

United States District Court
For the Northern District of California

17

law claims for promissory fraud, fraudulent concealment, intentional infliction of emotional distress ("IIED"), and unfair business practices under California's UCL. They also seek a declaratory judgment voiding written release agreements in which they waived the right to bring claims against Defendants Ally and Wrate. The Court discusses the federal claim and then the state law claims, concluding that each claim fails.

**A. RICO Claim**

To state a claim under RICO, a plaintiff must allege that Defendants (1) conducted or participated in the conduct, (2) of an enterprise (3) through a pattern (4) of racketeering activity. 18 U.S.C. § 1962(c); *Sedima v. Imrex Co., Inc.,* 473 U.S. 479, 496 (1985). They must also allege that they were injured, and that their injuries were factually and proximately caused by the defendants' actions. *Holmes v. Sec. Investor Prot. Corp.*, 503 U.S. 258, 267-74 (1992). To allege the predicate act of mail fraud, a plaintiff must show that "(1) the defendants formed a scheme or artifice to defraud; (2) the defendants used the United States mails or caused a use of the United States mails in furtherance of the scheme; and (3) the defendants did so with the specific intent to deceive or defraud." *Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1400 (9th Cir. 1986). "Similarly, a wire fraud violation[] consists of (1) the formation of a scheme or artifice to defraud (2) use of the United States wires or causing a use of the United States wires in furtherance of the scheme; and (3) specific intent to deceive or defraud." *Id.*

Defendants argue that the Groth Plaintiffs lack standing because their injury is derivative of the injury to now-bankrupt GBC and that the Groths fail to state a predicate act of mail or wire fraud with particularity under Rule 9(b). The Court finds the lack of standing an incurable deficiency and therefore does not reach the alternative ground.

United States District Court
For the Northern District of California

18

**1. Standing**

A plaintiff lacks standing to bring an action under RICO if its injury is derivative of the injury to another entity, such as a corporation.[11]  Thus, shareholders and guarantors of a corporation generally lack standing to assert RICO claims against third parties for injuries caused to the corporation, and through the corporation to the shareholder, guarantor, or creditor.  *Sparling v. Hoffman Const. Co., Inc.*, 864 F.2d 635, 641 (9th Cir. 1988) (no shareholder or guarantor standing); *see also id.* at 640 (collecting circuit cases); *Hamid v. Price Waterhouse*, 51 F.3d 1411, 1418-21 (9th Cir. 1995) (no standing for bank depositors); *Sherman v. British Leyland Motors, Ltd.,* 601 F.2d 429, 439-40 & nn.10 & 12-13 (9th Cir. 1979) (no shareholder, creditor, or guarantor standing).

The theory behind this rule is threefold: first, allowing victims injured indirectly to recover would require a complicated inquiry into how much of the plaintiff's damages was caused by the RICO violation, as opposed to other, independent factors; second, allowing recovery by those indirectly injured would require courts to apportion damages among all injured parties so as to "obviate the risk of multiple recoveries;" and third, the directly injured victims can generally be counted on to vindicate their rights.  *Holmes,* 503 U.S. at 269-70; *accord Stein v. United Artists Corp.*, 691 F.2d 885, 894 (9th Cir. 1982) (limitations on antitrust recovery are "those of remoteness and duplicate recovery").[12]

The limited exception to the general rule of no shareholder/guarantor standing is that a shareholder may establish an individual injury sufficient to confer standing by showing either "an injury distinct from that to other shareholders or a special duty between [the defendant] and the [plaintiff]."  *Sparling*, 864 F.2d at 640; *see also Abrahamson v. W. Sav. & Loan Ass'n*, CIV. 88-1677-PHX-SMM, 1994 WL 374294, *4, *6 (D. Ariz. Jan. 24, 1994).  Courts

---

[11] This has also been discussed as a requirement of proximate causation in RICO and antitrust cases.  *See Holmes*, 503 U.S. at 267-68; *At The Airport v. ISATA, LLC*, 438 F. Supp. 2d 55, 61 (E.D.N.Y. 2006) ("A plaintiff does not have standing under RICO if he suffered an injury that was indirectly and hence not proximately caused by the racketeering activity" (internal quotation marks, brackets, parentheses, and citation omitted)).

[12] The standing/ proximate cause analysis in RICO cases tracks that in antitrust cases because the damages provision of RICO, 18 U.S.C. § 1964(c), is modeled after section 4 of the Clayton Act.  *Holmes*, 503 U.S. at 267-68.

United States District Court

For the Northern District of California

have generally been very reluctant to apply this exception. *See, e.g., Solinger v. A&M Records, Inc.*, 586 F.2d 1304 (9th Cir. 1978) (president of a distributor alleging antitrust violations had driven it out of business failed to show a direct injury for standing purposes); *Sherman,* 601 F.2d at 439 (president and sole stockholder of corporation lacked standing); *Stein,* 691 F.2d 885 (primary shareholder and officer of business alleging operator had driven it out of business lacked standing); *see also id.* at 896 (collecting cases denying corporate officers and employees standing); *cf. Natomas Gardens Inv. Grp. LLC v. Sinadinos*, CIV.S-08-2308FCD/KJM, 2009 WL 1363382, at *12 (E.D. Cal. May 12, 2009) (minority shareholders had alleged an injury distinct from that to other shareholders in action against majority shareholders).[13]

Plaintiffs argue, in an attempt to get around this principle, that they are suing to recover for "injuries they sustained individually and independent of the injuries sustained by GBC[;]" namely, that they were forced to provide Ally a deed of trust on their property and later sell the property at a loss and give Ally the proceeds. Opp'n at 16. They argue that because Ally directly induced them to provide the guarantees – by promising not to terminate GBC's financing – the injury at issue is direct and individual, rather than derivative. They cite not a single case, however, in which an action by a guarantor, shareholder or employee was permitted to proceed.

Defendants urge the Court to follow *Lui Ciro, Inc. v. Ciro, Inc.*, 895 F. Supp. 1365 (D. Haw. 1995), which considered facts similar to those alleged here. The *Lui Ciro* plaintiffs, the sole shareholders and officers of a corporation, alleged that the defendant had fraudulently induced their corporation to invest in a joint venture with the defendant's corporation and to personally guarantee loans to the joint venture, including by using the plaintiffs' personal residence as collateral. *Id.* at 1372. The court found that the individual plaintiffs lacked

---

[13] *See also Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1280 (7th Cir. 1989) (creditors of bankrupt corporation had alleged individual injury sufficient to confer standing in action against corporate officers for driving corporation into insolvency in bust-out scheme); *Ceribelli v. Elghanayan*, 990 F.2d 62, 64 (2d Cir. 1993) (recognizing special duty owed by sellers of stock to shareholders).

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  standing to recover when the defendants failed to fulfill their promises, reasoning that the

2  risks the plaintiffs had undertaken by guaranteeing the venture amounted to "the risk

3  undertaken by any investor in a corporation." *Id.* at 1381. This was so even though the

4  plaintiffs alleged that the defendants had, by their fraud, induced the plaintiffs to become

5  guarantors in the first place. This holding was unsurprising: it has been clearly established

6  that even an allegedly defrauded creditor has no direct action; rather, he must "take his 'place

7  in line' as a creditor in the bankruptcy action." *Hamid*, 51 F.3d at 1420 (quoting *Mid-State*

8  *Fertilizer Co. v. Exchange Nat'l Bank of Chicago,* 877 F.2d 1333, 1336-37 (7th Cir. 1989)).

9      The Court follows suit in finding that Plaintiffs' claim is foreclosed by the case law

10  holding that a guarantor of a corporate debt lacks standing to sue the corporation's creditor

11  when the guarantor is forced to pay. Plaintiffs clearly sustained a loss in their personal

12  capacities when they secured GBC's debt with the GHLC property. However, a personal

13  loss does not an independent injury make – as is the case when any guarantor is called to pay

14  for the debt she has secured. *See Mid-State Fertilizer*, 877 F.2d at 1336 ("One could say that

15  guarantors are different [than creditors, who lack standing] because they may deal directly

16  with the wrongdoer. The [plaintiffs'] guarantees were contracts between them and [the

17  defendant]. But direct *dealing* is not the same as direct *injury*." (emphasis in original).

18  Because Plaintiffs' obligation to cover GBC's debt was triggered by GBC's failure to make

19  its payments to Ally in the first instance, Plaintiffs' injury is derivative. *See Hamid*, 51 F.3d

20  at 1420 ("When a creditor suffers injury that is independent of the firm's fate, his injury is

21  direct and he may pursue his own remedy; otherwise the injury is derivative . . . ." (internal

22  quotation marks and citation omitted)).[14]

23      Leave to amend in this situation would be futile. When the Court asked Plaintiffs at

24  the hearing what facts they would add if given leave to amend, they stated they would

25  include the additional fact that GBC did not default on its underlying debt obligation to Ally.

26  _____

27      [14] Once a chapter 7 bankruptcy trustee was appointed, the exclusive authority to
pursue any such claim on behalf of the bankrupt estate of GBC was vested in him. *See*
*Estate of Spirtos v. One San Bernardino Cnty. Superior Court Case Numbered SPR 02211*,

28  443 F.3d 1172 (9th Cir. 2006). The Groth Plaintiffs objected to the sale of GBC's assets,
including legal claims, to Inmato, but did not appeal the final sale order.

United States District Court

For the Northern District of California

1    However, this fact does not cure the problem.  Whether Plaintiffs liquidated the security (the

2    property) and paid the money to Ally because GBC defaulted or because they chose to do so

3    voluntarily as a business decision, they paid the money *in satisfaction of GBC's debt*

4    *obligation*.  Because Plaintiffs lack standing under RICO, the claim is DISMISSED WITH

5    PREJUDICE.

6

7    **B.  State Law Claims**

8         The Groth Plaintiffs' Tenth Cause of Action is for declaratory relief voiding various

9    Release Agreements the Groths signed with Ally.  The Court discusses this claim first and

10    finds that the May, 2010 Release Agreement is valid and bars the claims against Ally and

11    Wrate, except the intentional infliction of emotional distress ("IIED") claim.  The Court then

12    considers the two fraud claims, the IIED claim, and the UCL claim in turn.[15]

13

14        **1. Claim for Declaratory Relief Voiding Release Agreements**

15        After GBC breached the financing agreement with Ally in October, 2008, Plaintiffs

16    signed a total of seven Workout/Forbearance agreements with Ally in which Ally agreed to

17    extend financing in exchange for certain promises on the Plaintiffs' and GBC's part.  *See*

18    FAC ¶¶ 208-209 & Exs. D-F & I-L.  The third of these agreements was a Workout

19    Agreement signed by Plaintiffs on May 18, 2010.  The parties focus their arguments on this

20    May, 2010 Release ("Release" or "Release Agreement").  FAC Ex. I.  In it, GBC, Robin Hill,

21    Joseph Hill, and David Groth "each expressly and affirmatively waive[d] and release[d]

22    GMAC [Ally's predecessor] and all of its directors, officers, . . . [and] employees . . . from

23    any and all past and present claims, defenses, causes of action, or damages arising from any

24    and all dealings . . . ."  *Id.*  Ally argues the Release is valid and enforceable and acts as a

25

26

27

28        [15] Defendant Dosanjh argues, as to all of the Groths' causes of action, that he cannot
be held liable because he acted within the scope of his employment.  Because the Court
dismisses all of the allegations against Dosanjh on other grounds, it need not reach this issue.

1    substantive bar to the Groths' claims.  The Groths argue for rescission of the Release

2    Agreement based on economic duress and undue influence.  FAC ¶ 207; Opp'n at 18-21.[16]

3         Economic duress is a common law basis for rescission of a contract.  The doctrine

4    "may come into play upon the doing of a wrongful act [by one party] which is sufficiently

5    coercive to cause a reasonably prudent person faced with no reasonable alternative to

6    succumb to the perpetrator's pressure."  *Rich & Whillock, Inc. v. Ashton Dev., Inc.,* 157 Cal.

7    App. 3d 1154, 1158 (1984).  "The underlying concern of the economic duress doctrine is the

8    enforcement in the marketplace of certain minimal standards of business ethics."  *Id.* at 1159.

9    Under this view, "[h]ard bargaining, 'efficient' breaches and reasonable settlements of good

10   faith disputes are all acceptable, even desirable, in our economic system."  *Id.* (citation

11   omitted).  The parties dispute whether Ally's threat to terminate GBC's financing was a

12   "wrongful act" sufficient to support a claim of economic duress.  Opp'n at 19; Ally Mtn. at

13   11.

14        Plaintiffs allege that Defendants' illicit scheme to "coerce" the dealerships to either

15   sell or surrender constitutes a "wrongful act" within the law.  FAC ¶ 21; Opp'n at 19.  This

16   logic is circular.  At first blush, Ally's threat to terminate GBC's financing looks coercive: it

17   put the Groths in a position of having to agree to whatever conditions Ally imposed in order

18   to stay in business.  However, the "threat" by Ally which purportedly caused the duress was

19   Ally's threat to do that which it had a contractual right to do: to terminate the floorplan

20   financing when GBC failed to meet its obligations under the Wholesale Finance and

21   subsequent forbearance agreements.  The threat of withdrawing the financing may have been

22   powerful enough to induce Plaintiffs to make imprudent business decisions.  But that does

23   not make Ally's act "wrongful."  *See London Homes, Inc. v. Korn*, 234 Cal. App. 2d 233,

24   239-40 (1965) ("The plaintiff was not required to enter into [the contract in question] . . . ; it

25   voluntarily (from the legal standpoint) chose so to act after considering all the elements that

26

27        [16] Plaintiffs additionally argue for the rescission of three earlier release agreements
     based on fraudulent inducement, but do not argue this as to the May, 2010 Release.  Because
28   the May, 2010 Release bars Plaintiffs' claims, the Court does not consider whether the older
     release agreements are valid or not.

then existed, including the pressure of time." (parentheses in original)).  Plaintiffs' economic duress agreement fails because Ally was simply exercising its rights under the contracts.

Plaintiffs give passing mention to an argument for rescission based on undue influence.  *See* FAC ¶ 210 & Opp'n at 21.  To state a claim of undue influence, a plaintiff must allege that the party against whom rescission is sought took advantage of the mental weakness or incapacity of the other party.  *Das v. Bank of Am., N.A.,* 186 Cal. App. 4th 727, 743 (2010).  No such facts are alleged here.

The May 18, 2010 Release Agreement is binding.  Plaintiffs' Tenth Cause of Action for declaratory relief is therefore DISMISSED WITH PREJUDICE.

### 2. Promissory Fraud Claim

Plaintiffs allege that in October, 2008 and before June 1, 2009, Defendant Wrate made false promises to them on the phone that Ally would not terminate GBC's flooring and would "stop harassing the dealership" if Plaintiffs executed personal guarantees, secured those guarantees by giving Ally a first deed of trust on the GHLC property, and then sold the property and turned the proceeds over to Ally.  FAC ¶¶ 132-36.[17]  Defendants argue the allegations fail to state a claim of promissory fraud because: (1) Plaintiffs' claims against Ally are barred by the Release; and (2) Plaintiffs are barred by the parol evidence rule from seeking to introduce evidence of oral promises by Ally which directly contradict the terms of the written agreements between GBC and Ally.[18]

The elements of common-law fraud are "(a) misrepresentation (false representation,

---

[17] The Court notes from the outset that because Plaintiffs lack standing to recover for injuries to GBC itself, the only injury which could conceivably form the basis for an action by these Plaintiffs is the loss that they suffered in their personal capacities.

[18] Defendants additionally argue that: (1) even if Ally promised not to terminate the financing and stop "harassing" the dealership, Plaintiffs cannot show that it did not intend to perform, given that it continued financing for another 18 months after the alleged promises and only imposed such audits and curtailments as the contracts authorized it to do; and (2) there are no facts to support conspiracy liability against the GM and CARG Defendants with regard to the alleged oral promises by Ally to Plaintiffs.  Because the Court dismisses the claim against all Defendants on other grounds, it does not reach these arguments.

United States District Court
For the Northern District of California

concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996) (internal quotation marks and citations omitted) (parentheses in original).  Promissory fraud is a subset of fraud: A "promise to do something necessarily implies the intention to perform; hence, where a promise is made without such intention, there is an implied misrepresentation of fact that may be actionable fraud." *Id.* (citation omitted); *see also* Cal. Civ. Code § 1710(4) (defining tort of deceit as including "[a] promise, made without any intention of performing it").  "Proof of intent not to perform is required.  It is insufficient to show an unkept but honest promise, or mere subsequent failure of performance." *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55 Cal. 4th 1169, 1183 (2013) (internal quotation marks and citation omitted).  Plaintiffs argue that the GM and CARG Defendants are liable for Ally's false promises on a conspiracy theory of liability.

### a. Release

As discussed above, the May 18, 2010 Release Agreement bars Plaintiffs' claims against Ally.  Defendant Wrate, as an employee/officer of Ally, is covered under the language of the release.  *See* FAC Ex. I.  The Sixth Cause of Action against Ally and Wrate is therefore DISMISSED WITH PREJUDICE.

### b. Parol evidence rule

The remaining Defendants argue that Ally's actions in conducting audits and eventually terminating GBC's financing were consistent with its rights under the forbearance agreements,[19] and that Plaintiffs are barred from raising any alleged oral promises by Ally which contradict the terms of the contracts.[20]  The Court agrees.

Under California law, a written contract supersedes all negotiations or stipulations

---

[19] *See, e.g.,* FAC Ex. I (May 18, 2010 agreement providing that if GBC did not meet all of its obligations by August 2, 2010, "GMAC may pursue any and all rights and remedies under the Agreements and the law").

[20] Plaintiffs allege that Defendant Wrate made these oral promises on the phone in October, 2008 and before June 1, 2009.  FAC ¶¶ 132-36.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1    concerning the same matter.  *See* Cal. Code Civ. P. § 1856.

> The parol evidence rule is not merely a rule of evidence excluding precontractual discussions for lack of credibility or reliability.  It is a rule of substantive law making the integrated written agreement of the parties their exclusive and binding contract *no matter how persuasive the evidence* of additional oral understandings.  Such evidence is legally irrelevant and cannot support a judgment.

*Marani v. Jackson*, 183 Cal. App. 3d 695, 701 (1986) (citation omitted) (emphasis in original); *see also Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 346 (2004) ("our courts have consistently rejected promissory fraud claims premised on prior or contemporaneous statements at variance with the terms of a written integrated agreement").  Plaintiffs do not attack the validity of the written agreements or argue that Ally breached the written contracts;[21] instead they argue that because this proceeding deals with a claim of fraud, the parol evidence rule does not apply.  *See* Opp'n at 22-23.

Plaintiffs are correct that a fraud exception to the parol evidence rule permits the use of extrinsic evidence to attack the validity of an integrated written agreement.  *See Riverisland*, 55 Cal. 4th at 1174-75 ("Evidence to prove that the [written] instrument is void or voidable for mistake, fraud, duress, undue influence, illegality, alteration, lack of consideration, or another invalidating cause is admissible" (internal quotation marks and citation omitted)).  However, Plaintiffs in their promissory fraud claim do not attack the validity of the seven forbearance and workout agreements they signed with Ally.  Instead, they seek to recover based on promises Ally allegedly made to them over the phone, promises which run counter to the terms of the written contracts.  The fraud exception to the parol evidence rule does not apply in these circumstances; the parol evidence rule does.

Plaintiffs are barred, as a matter of state law, from introducing alleged oral promises which contradict the terms of the written agreements Plaintiffs signed with Ally.  Their promissory fraud claim is based on these alleged oral promises.  Therefore, the claim is

---

[21] In response to direct questioning from the Court on this issue, Plaintiffs' counsel stated at the hearing that while Ally did not breach any "specific term" of the agreement, it nonetheless violated the covenant of good faith and fair dealing attendant to every contract.  The covenant of good faith and fair dealing, however, will not prohibit a party from doing what it is expressly permitted to do under a contract's terms.  *Wolf v. Walt Disney Pictures & Television,* 162 Cal. App. 4th 1107, 1120 (2008).

1  DISMISSED WITH PREJUDICE.

2

3          **3. Fraudulent Concealment Claim**

4          As discussed previously, the Release Agreement bars the claim against Ally and

5  Wrate.  The Sixth Cause of Action against them is therefore DISMISSED WITH

6  PREJUDICE.

7          Plaintiffs seek to hold the remaining Defendants liable under a conspiracy theory of

8  liability.[22]  The claim fails for several reasons.  First, as stated elsewhere in this Order,

9  Plaintiffs lack standing to sue based on any conspiracy to drive the GBC *dealership* out of

10  business.[23]  Second, even if they had standing, they allege no actionable fraud.  As discussed

11  above with regard to the Crown Plaintiffs' fraudulent concealment claim, a claim of

12  fraudulent concealment depends on the concealment of a fact the defendant had a duty to

13  disclose.  *Kaldenbach,* 178 Cal. App. 4th at 850.  There is no duty to disclose one's intent to

14  commit a tort.  *LiMandri*, 52 Cal. App. 4th at 338; *Bank of Am. Corp.*, 198 Cal. App. 4th at

15  872-73.  Because the Groth Plaintiffs premise their claim on the Defendants' failure to

16  disclose their conspiracy to drive GBC out of business, FAC ¶ 153, the claim fails.

17          Finally, in order to allege co-conspirator liability on the part of the CARG and GM

18  Defendants, Plaintiffs must demonstrate more than "mere association" by the co-

19  conspirators.  *Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1582 (1995).

20  Plaintiffs must allege not only that the co-conspirators *knew* about any fraud perpetrated by

21  Ally in its efforts to obtain the Groths' personal property, but that the co-conspirators

22  *intended* to aid in Ally's objective.  *Id.* at 582-83.  The claim as pleaded is utterly lacking in

23  ───────────────

24          [22] Civil conspiracy consists of "(1) the formation and operation of the conspiracy, (2)
   the wrongful act or acts done pursuant thereto, and (3) the damage resulting from such act or

25  acts." *Lyons v. Sec. Pac. Nat. Bank*, 40 Cal. App. 4th 1001, 1018-19 (1995) (internal
   quotation marks and citation omitted).  Accordingly, "[n]o cause of action for conspiracy can

26  exist unless the pleaded facts show something was done which, without the conspiracy,
   would give rise to a right of action." *Id.* at 1019 (internal quotation marks and citations

27  omitted); *see also Doctors' Co. v. Superior Court*, 49 Cal. 3d 39, 44 (1989).

28          [23] Plaintiffs do not dispute Defendants' contention that the same standing analysis
   applies under California law as under RICO.  *See Sherman*, 601 F.2d at 440 n.13.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  allegations connecting the GM and CARG Defendants to any offense against the Plaintiffs in

2  their personal capacity.

3      Because the complaint states neither co-conspirator liability against the GM and

4  CARG Defendants nor any underlying fraud for which Plaintiffs have standing to sue, the

5  claim against the GM and CARG Defendants must be DISMISSED.  The Court grants leave

6  to amend but strongly cautions Plaintiffs to carefully consider the deficiencies outlined in this

7  Order and the dictates of Rule 11 in any amended pleading.

8

9      **4. Claim for Intentional Infliction of Emotional Distress ("IIED")**

10     The elements of the tort of IIED are: "(1) extreme and outrageous conduct by the

11  defendant with the intention of causing, or reckless disregard of the probability of causing,

12  emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3)

13  actual and proximate causation of the emotional distress by the defendant's outrageous

14  conduct." *Christensen v. Superior Court*, 54 Cal. 3d 868, 903 (1991) (internal quotation

15  marks and citation omitted).  To be outrageous, the conduct must be so extreme as to "exceed

16  all bounds of decency in a civilized community." *Yun Hee So v. Sook Ja Shin*, 212 Cal. App.

17  4th 652, 671 (2013) (internal quotation marks and citation omitted).  Defendants argue that

18  the claim is untimely and fails to allege outrageous conduct directed at Plaintiffs.[24]

19     The statute of limitations for a claim of Intentional Infliction of Emotional Distress

20  ("IIED") is two years.  Cal. Code Civ. P. § 335.1; *Pugliese v. Superior Court*, 146 Cal. App.

21  4th 1444, 1450 (2007).[25]  The cause of action "accrues, and the statute of limitations begins

22  to run, once the plaintiff suffers severe emotional distress as a result of outrageous conduct

23

24     [24] The Ally Defendants additionally argue, in a single sentence, that the IIED claim against them is barred by the Release.  Ally Mtn. at 18 n.15.  They provide no authority in

25  support of this position and the Court declines to adopt it.  *Cf.* Rest. 2d Contracts § 195(1) ("A term exempting a party from tort liability for harm caused intentionally or recklessly is

26  unenforceable on grounds of public policy."); *City of Santa Barbara v. Superior Court*, 41 Cal. 4th 747, 760-61 & n.20 (2007); *Tayar v. Camelback Ski Corp., Inc.,* 47 A.3d 1190,

27  1201-03 (Pa. 2012).

28     [25] Defendants argue that a one-year statute of limitations applies, citing California Code of Civil Procedure § 340(c).  However, § 340(c) does not mention IIED.

United States District Court

For the Northern District of California

1   on the part of the defendant." *Cantu v. Resolution Trust Corp.*, 4 Cal. App. 4th 857, 889

2   (1992) (citing *Murphy v. Allstate Ins. Co.,* 83 Cal. App. 3d 38, 50-51 (1978)).

3       The Groth Plaintiffs filed their action on October 25, 2012.  The claim is thus

4   untimely if the cause of action accrued before October 25, 2010.  Plaintiffs argue for a

5   November, 2011, accrual date because "the severity of [Robin Hill's] emotional distress did

6   not manifest itself" until that time.  FAC ¶ 193; Opp'n at 34.  This contention is illogical and

7   unsupported.  Plaintiffs are correct that "the point at which the defendant's conduct has

8   become sufficiently outrageous and the plaintiff's emotional distress sufficiently severe for

9   the plaintiff to state a cause of action will be questions of fact."  *Murphy,* 83 Cal. App. 3d at

10  51.  However, Plaintiffs provide no factual support for the conclusory and self-serving

11  allegation that Robin Hill's emotional distress "did not manifest itself" until November,

12  2011.  Without any rhyme or reason to the assertion that her emotional distress began in

13  November, 2011, despite years of dealing with Defendants, the letter to her mother in April

14  or May of 2010, the loss of the GHLC property in June, 2010, and the termination of the

15  financing in December, 2010,[26] the assertion is not entitled to deference.  *See Starr*, 652 F.3d

16  at 1216.  Accordingly, the claim is time-barred.

17      Defendants further argue that the conduct alleged is not "directed at" Plaintiffs.  To

18  constitute IIED, conduct must be "directed at the plaintiff, or occur in the presence of a

19  plaintiff of whom the defendant is aware" and it must be *especially calculated to cause . . .*

20  distress of a very serious kind."  *Christensen,* 54 Cal. 3d at 903-04 (internal quotation marks

21  and citation omitted) (emphasis is original).  This factor "distinguishes intentional infliction

22  of emotional distress from the negligent infliction of such injury."  *Id.* at 904.[27]

23      Defendants are correct.  The majority of Plaintiffs' allegations fail to posit conduct

24  directed at Plaintiffs, as opposed to at GBC.  The allegations that, for example, Defendants

25  _____

26      [26] Plaintiffs do not state when Defendant Dosanjh allegedly called Plaintiff Robin Hill
    a "cunt."  FAC ¶ 57 & 191.

27      [27] Recovery based on a theory of reckless conduct has generally only been permitted
28  under limited circumstances, including funeral-related services or "the most extreme cases of
    violent attack, where there is some especial [sic] likelihood of fright or shock."  *Christensen,*
    54 Cal. 3d at 905 (internal quotation marks and citation omitted).

United States District Court

For the Northern District of California

1    conspired to "shut down Robin Hill's family business," FAC ¶¶ 188-191; conspired to

2    "apply[] severe financial pressure" on GBC, FAC ¶ 191; and that the Ally Defendants told

3    "Robin Hill that Ally would not terminate the Groth Bros. floorplan and would stop

4    harassing the dealership, when they had no intention of doing so," FAC ¶ 188, are all

5    directed at putting *the dealership* out of business.  These allegations involve neither conduct

6    "directed at" these Plaintiffs nor conduct for which these Plaintiffs have standing to sue.

7    Accordingly, Plaintiffs fail to state a claim of IIED.

8         For these reasons, the IIED claim against all Defendants is DISMISSED.  The Court

9    grants leave to amend to allege an IIED claim that is based on conduct that is outrageous, that

10   is directed at these Plaintiffs in their individual capacities, and that is timely.

11

12        **5. Unfair Business Practices Claim**

13        Plaintiffs seek injunctive relief and attorneys' fees under California's Unfair

14   Competition Law ("UCL").  FAC ¶¶ 195-205.  However, "[i]njunctive relief has no

15   application to wrongs which have been completed, absent a showing that past violations will

16   probably recur."  *People v. Toomey*, 157 Cal. App. 3d 1, 20 (1984) (citations omitted); *see*

17   *also Madrid v. Perot Sys. Corp.*, 130 Cal. App. 4th 440, 463 (2005) ("Injunctive relief is

18   appropriate only when there is a threat of continuing misconduct" (citing Cal. Code Civ. P. §

19   525)).

20        Accordingly, the UCL claim is DISMISSED WITH PREJUDICE.

21

22   **CONCLUSION**

23        The Crown Plaintiffs' claims (First through Fourth Causes of Action) are

24   DISMISSED WITH LEAVE TO AMEND.  In light of the law on limitations and the

25   underlying claims, the Court strongly cautions Plaintiffs to heed the dictates of Rule 11 in

26   any amended filings with this Court.

27        The Groth Plaintiffs' Fifth Cause of Action for promissory fraud is DISMISSED

28   WITH PREJUDICE as to all Defendants.  The Sixth Cause of Action for fraudulent

concealment is DISMISSED WITH PREJUDICE as to the Ally Defendants and
DISMISSED WITHOUT PREJUDICE as to the CARG and GM Defendants.  The Court
again cautions Plaintiffs to carefully consider the deficiencies outlined above and the dictates
of Rule 11 in any amended pleadings.  The Seventh Cause of Action for violation of RICO is
DISMISSED WITH PREJUDICE for lack of standing.  The Eighth Cause of Action for
Intentional Infliction of Emotional Distress is DISMISSED WITHOUT PREJUDICE, again
subject to the Court's warning.  The Ninth and Tenth Causes of Action for Unfair Business
Practices and Declaratory Relief, respectively, are DISMISSED WITH PREJUDICE.

Any amended complaint shall be filed by Plaintiffs on or before **August 16, 2013**.

**IT IS SO ORDERED.**

Dated: 7/23/2013

THELTON E. HENDERSON, JUDGE
UNITED STATES DISTRICT COURT

United States District Court
For the Northern District of California

31